# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JASON BOUDREAU,
    Plaintiff,

    v.

DOUG SMITH, et al.,
    Defendants.

No. 3:17-cv-589 (SRU)

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SANCTIONS

On April 10, 2017, the plaintiff, Jason Boudreau, a federal inmate, filed a civil rights complaint *pro se* pursuant to 42 U.S.C. § 1983 against the town of Branford, Connecticut, the Branford Police Department ("BPD"), five members of the BPD, and four members of the United States Department of Homeland Security ("DHS") for using excessive force during his arrest in violation of his Fourth Amendment protection against unreasonable seizures.

All claims against the town of Branford, the BPD, and all BPD officers have been dismissed. *See* Initial Review Order, Doc. No. 9, at 13; Stipulation of Dismissal, Doc. No. 39; Ruling, Doc. No. 50. The only remaining claim in this case is a Fourth Amendment claim for excessive force against DHS officers Doug Smith, David Riccio, and Brendan Cullen (collectively, the "Federal defendants")[1] based on their failure to intervene when BPD officers permitted a BPD canine named "Joker" to approach Boudreau while he was handcuffed and detained and then to bite Boudreau's leg. *See* Ruling, Doc. No. 50, at 15. Boudreau brings his constitutional claims against the Federal defendants in their individual capacities for damages under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

The Federal defendants have filed a motion for summary judgment, doc. no. 72, and argue, first, that they are not liable for the alleged Fourth Amendment violation, and, in the alternative, that they are entitled to qualified immunity. Relatedly, Boudreau has filed a motion for discovery sanctions. *See* Mot. for Sanctions, Doc. No. 110. For the reasons that follow, the Defendants' motion for summary judgment, doc. no. 72, is **granted**, and Boudreau's motion for sanctions, doc. no. 110, is **denied**.

## I. Defendants' Motion for Summary Judgment (Doc. No. 72)

### A. Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment). When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to

---

[1] On May 28, 2019, Boudreau filed a notice of voluntary dismissal against James Bentz. *See* Notice, Doc. No. 93.

establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," a court may grant summary judgment. *Anderson*, 477 U.S. at 249–50. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Regarding materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary

judgment may enter.  *Celotex*, 477 U.S. at 323.

Although the court is required to read a self-represented party's papers "liberally to raise

the strongest arguments that they suggest," *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015),

"unsupported allegations do not create a material issue of fact" and do not overcome a properly

supported motion for summary judgment.  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d

Cir. 2000).

B.  Facts

On December 28, 2015, a Magistrate Judge in Rhode Island issued an arrest warrant and

complaint against Boudreau for child pornography offenses.  *See* Defs.' 56(a)1 Stmnt. ("56(a)1

Stmnt."), Doc. No. 72-2, at ¶¶ 3–4.  At the times relevant to this action, Smith oversaw the

execution of arrest warrants as the Resident Agent in Charge ("RAC") of the New Haven office

of DHS's Homeland Security Investigations ("HSI") division.  *Id.* at ¶¶ 124–25.  Cullen was the

RAC of the HSI Rhode Island office.  *See* Cullen Decl., Ex. C to Defs.' Mot. for Summ. J.

("Cullen Decl."), Doc. No. 72-5, at ¶ 1.  Riccio was an HSI Special Agent who investigated

criminal activities in Rhode Island.  Riccio Decl., Ex. D to Defs.' Mot. for Summ. J. ("Riccio

Decl."), Doc. No. 72-6, at ¶ 1.

On December 29, 2015, Cullen and Riccio attempted to execute the outstanding arrest

warrant for Boudreau, but they had trouble locating Boudreau in Rhode Island.  *See* 56(a)1

Stmnt., Doc. No. 72-2, at ¶¶ 8–20.  The Rhode Island State Police requested cell-site location

information ("CSLI") from Sprint to assist Cullen and Riccio in locating Boudreau.  *See id.* at ¶

21.  That CSLI led Cullen and Riccio to Connecticut.  *See id.* at ¶ 22.  Cullen called Smith, who

4

worked at the HSI office in New Haven, to tell Smith about Boudreau and that Rhode Island law enforcement believed Boudreau was in Connecticut. *See id.* at ¶ 23. Smith avers that he then contacted the BPD to let them know that HSI special agents would be in the area looking for Boudreau. *See* Smith Decl., Ex. E to Defs.' Mot. for Summ. J. ("Smith Decl."), Doc. No. 72-7, at ¶ 4. The BPD then offered to assist in the effort to search for Boudreau. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 25. Ultimately, the BPD dispatched Officer Jay Kaufman and others to assist the Federal defendants in locating and apprehending Boudreau. *See* Kaufman Decl., Ex. F to Defs.' Mot. for Summ. J. ("Kaufman Decl."), Doc. No. 72-8, at ¶ 5.

Upon arriving in Connecticut, Cullen and Riccio went first to East Haven because that is where CSLI indicated that Boudreau's cell phone was. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 26. After Cullen and Riccio arrived in East Haven, CSLI indicated that Boudreau's cell phone was in Branford "near a plaza on Main Street, which contained many stores, including a Kohl's Department Store and a GameStop," which I will call the "Plaza." *See id.* at ¶ 27. While they waited to meet with Smith and BPD officers, Cullen and Riccio drove up and down the streets near the Plaza looking for Boudreau. *See id.* at ¶ 28. Boudreau's vehicle, a rental car that agents knew Boudreau was using, was located at the Plaza, although Boudreau was not in the vehicle at that time. *See id.* at ¶¶ 29–30. Cullen and Riccio, as well as other BPD officers, searched for Boudreau in the Plaza's different stores, but they did not find him. *See id.* at ¶¶ 31–32. The BPD officers and the Federal defendants sat in the Plaza and watched Boudreau's car while they waited for the stores to close and the parking lot to empty, but Boudreau did not come for his car. *See id.* at ¶¶ 33–34. Cullen, Riccio, and other law enforcement officers looked for Boudreau in nearby restaurants and bars and along a nearby wooded train track area, but they could not find

him, and so Cullen and Riccio returned to the parking lot where Boudreau's rental vehicle was located. *See id.* at ¶¶ 36–38. At that point, Cullen and Riccio learned from Rhode Island law enforcement agents that CSLI indicated that Boudreau's cell phone was near a bowling alley in Branford. *See id.* at ¶ 40.

### 1. *The Track*

In this case, the Defendants submitted five videos of body camera footage from different BPD officers that (partially) capture the events in question in this case. *See* Bodycam Footage, Ex. G to Defs.' Mot. for Summ. J., Doc. No. 72-9.[2] Bodycam Footage indicates that the Federal defendants and BPD officers discussed Boudreau's possible location near the bowling alley. *See* Video 1, Doc. No. 72-9, at 1:33–40. Someone then asked BPD Officer Melissa Carney if she wanted to "run with the dog," and she responded, "Of course I want to run with the dog!" *Id.* at 1:43–48. BPD Officer Carney and other BPD officers provided Cullen and Riccio directions to the area of the bowling alley, and Cullen and Riccio proceeded to that area to search for Boudreau. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶¶ 41–42. Smith, though, stayed at the Plaza near Boudreau's rental vehicle, in case Boudreau returned. *See* Smith Decl., Doc. No. 72-7, at ¶ 11.

Soon after Cullen and Riccio departed, Joker and Joker's handler—a BPD Canine Officer—arrived, and Joker began to track Boudreau's scent; BPD Officer Carney followed behind Joker and the BPD Canine Officer. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 52. The BPD

---

[2] I refer to the various videos as follows: "Video 1" is the file PICT0005_2015.12.30_04.00.46.AVI. It appears to the be Bodycam Footage from BPD Officer Carney. "Video 2" is the file PICT0011_2015.12.30_04.08.14.AVI. It appears to be the Bodycam Footage from the BPD Canine Officer (Joker's handler). "Video 3" is the file PICT0012_2015.12.30_04.16.28.AVI. It appears to be the Bodycam Footage from BPD Officer Kaufman. "Video 4" is PICT0012_2015.12.30_04.37.26.AVI. I do not rely on Video 4. "Video 5" is PICT0014_2015.12.30_04.15.56.AVI. "Video 6" is PICT0015_2015.12.30_04.35.46.AVI. I do not rely on Video 6.

Canine Officer instructed BPD Officer Carney to remain fifteen feet behind him during the track. *See* Video 1, Doc. No. 72-9, at 8:04–08. Less than five minutes after Joker began tracking Boudreau, Officer Carney received a radio message conveying that Boudreau had been located at a bar called the Cue & Brew. *See* Video 1, Doc. No. 72-9, at 8:43–13:28 (beginning of Joker's track to radio message). BPD Officer Carney let the BPD Canine Officer know that Boudreau was in the Cue & Brew, and the Canine Officer responded, "That's where [Joker's] going." *Id.* at 13:37.

At that point, BPD Officer Carney stopped following Joker and got into a trailing police vehicle to get to the Cue & Brew more quickly.[3] *Id.* at 13:49. Another BPD officer—Officer Kaufman—radioed shortly thereafter to indicate that Boudreau was in custody at the Cue & Brew. *Id.* at 13:59. The BPD Canine Officer responds, "Jay, hold him there, canine's tracking right up commercial parkway." *Id.* at 14:05. A BPD officer from the Cue & Brew radioed again to report that Boudreau had been positively identified. *Id.* at 14:30. The BPD Canine Officer responds, "Yeah, Roger, I just wanted to see if the dog is coming your way now. I wanna see if he's, uh, gonna alert to him. Just for my training." *See id.* at 14:36–40; Video 2, Doc. No. 72-9, at 7:07–15. About five minutes later, the BPD Canine Officer subsequently stated, "Just have him standing outside . . . have that individual outside the car, just standing there." Video 2, Doc. No. 72-9, at 12:39–54. The BPD Canine Officer did not advise that he would bring Joker into the Cue & Brew upon his arrival. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 61.

   2. *At the Cue & Brew*

---

[3] When Officer Carney entered the Cue & Brew, a BPD officer, whom Boudreau identifies as Officer Kaufman, was standing next to one of the Federal defendants, whom Boudreau identifies as Cullen. *See* Pl.'s Response, Doc. No. 96, at ¶ 57; Video 1, Doc. No. 72-9, at 15:20–38.

Cullen and Riccio had arrived at the Cue & Brew while Joker's track was underway. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 66. Cullen and Riccio observed a man matching Boudreau's description attempting to exit the establishment with a female. *See id*. at ¶ 67. Cullen and Riccio stopped Boudreau and asked him his name. *See id.* at ¶ 69. Cullen and Riccio recount that Boudreau gave them a false name and told them his identification was with his friends at a pool table at the back of the Cue & Brew. *See id.* at ¶¶ 70–72. Cullen and Riccio represent that Boudreau's friends refused to speak with them or to provide them with Boudreau's identification. *See id.* at ¶¶ 74–75. Boudreau eventually informed Cullen and Riccio that his identification was at the front desk. *See id.* at ¶ 76; Pl.'s Response, Doc. No. 96, at ¶ 76. Cullen and Riccio escorted Boudreau to the front desk, where a BPD officer was talking to a Cue & Brew employee. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶¶ 77–78; Pl.'s Response, Doc. No. 96, at ¶ 77. After Boudreau's identity was confirmed, BPD officers handcuffed Boudreau and emptied his pockets while he remained standing next to a pool table. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 80; Pl.'s Response, Doc. No. 96, at ¶ 80 ("The Plaintiff was already in handcuffs when video 3 begins. Officer Kaufman is frisking the Plaintiff and emptying his pockets."); Video 3, Doc. No. 72-9, at 0:27–1:23.

While Boudreau remained beside the pool table, Cullen proceeded to the area in the back of the Cue & Brew to speak with Boudreau's friends. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 82; Video 5, Doc No. 72-9, at 1:45–5:44. Riccio remained close to Boudreau. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶ 83. After Cullen returned to the area near the pool table where Boudreau was detained, Boudreau asked Cullen a question about gathering his personal belongings from his rental vehicle, and Cullen answered that he was trying to make such arrangements. *See id.* at

¶¶ 84–85.  Bodycam Footage indicates that, at this point, which was before Joker arrived, Cullen and Riccio walked away from the area where Boudreau was detained.  *See* Video 3, Doc. No. 72-9, at 5:29–31; Video 5, Doc. No. 72-9, at 6:10–15.

Around a minute later, Joker entered the Cue & Brew on a leash, approached Boudreau, and the BPD Canine Officer instructed Joker to find Boudreau by saying "Who is it, buddy? Who is it?"  *See* Video 3, Doc. No. 72-9, at 6:42.  Boudreau stood next to the pool table and was surrounded by several BPD officers.  *See id.* at 6:42–7:17; Video 1, Doc. No. 72-9, at 22:20–23:09; Video 2, Doc. No. 72-9, at 15:03–36; Video 5, Doc. No. 72-9, at 7:16–8:04.  After being in Boudreau's vicinity for more than 30 seconds, Joker then made some type of contact with Boudreau.  In his amended complaint, Boudreau alleged that, in this instance, the defendants "allowed Joker to nudge the Plaintiff's legs with his nose."  *See* Am. Compl., Doc. No. 113, at ¶¶ 43, 45.  However, in his Opposition here, Boudreau represents that the same incident was Joker's first of two "bites."  *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), Doc. No. 124, at 22.  The Bodycam Footage does not indicate whether Joker's first contact with Boudreau was a "nudge" or a "bite."  However, the BPD Canine Officer can be heard telling Joker, "No," and instructing Joker to "leave it."  *See* Video 2, Doc. No. 72-9, at 15:37–38; Video 3, Doc. No. 72-9, at 7:15–16; Video 5, Doc. No. 72-9, at 7:57–58.

Boudreau, who did not appear to exhibit expressions of pain or distress, immediately afterwards asked the BPD officers surrounding him: "Is he still in training?"  *See* Video 3, Doc. No. 72-9, at 7:18–19; Video 5, Doc. No. 72-9, at 8:00–01.  The BPD officers answered Boudreau in the negative.  *See id.*  Approximately six to seven seconds later, Joker bit Boudreau.  *See* Video 2, Doc. no. 72-9, at 15:47; Video 3, Doc. No. 72-9, at 7:26–27 (Boudreau lurches

forward); Video 5, Doc. No. 72-9, at 8:08. The time between Joker's first contact with Boudreau and the later bite is approximately eleven (11) seconds.

The immediate circle of officers surrounding Boudreau all appear to be BPD officers. Cullen and Riccio do not appear in Boudreau's immediate vicinity. In Video 2, a male individual with a dark jacket faces Boudreau and stands behind BPD Officer Carney just prior to Joker's first contact with Boudreau. *See* Video 2, Doc. No. 72-9, at 15:24–27. Although difficult to see, in Video 3, at the same time, a different male individual is on the phone, standing behind Officer Carney and facing Boudreau. *See* Video 3, Doc. No. 72-9, at 7:21–23. Those two individuals appear to be Riccio and Cullen, respectively, although the lighting in the videos does not permit a view of the individuals' faces. After Joker bit Boudreau, the BPD Canine Officer stepped away with Joker and talked to Officer Carney. *See* Video 2, Doc. No. 72-9, at 15:48–16:35; Video 3, Doc. No. 72-9, at 7:27–8:10. The video footage indicates that the BPD Canine Officer also conversed with Riccio, while Cullen remained on his cell phone.[4] *See id.*

Shortly after Joker's bite, Boudreau stated, "I think he broke the skin on that last bite there." Video 3, Doc. No. 72-9, at 8:35–40. When a BPD officer (apparently Officer Kaufman) asked Boudreau whether he wanted medical attention, Boudreau indicated that he would "take a look at it later on" and that "it stings like a bastard." *See id.* at 8:55–9:02. A few minutes later, when a different BPD officer asked Boudreau whether he needed medical attention, Boudreau stated again that it "stings a bit." *See id.* at 12:40–46. A little more than five minutes after that (a little more than ten minutes after the bite), a BPD officer (again, apparently Officer Kaufman) took Boudreau to the Cue & Brew bathroom, where the BPD officer took a picture of the bite on

---

[4] I can identify those individuals as Riccio and Cullen based on the Bodycam Footage and Riccio and Cullen's own description of their conduct. *See* Defs.' Mem. in Supp. of Mot. for Summ. J., Doc. No. 72-1, at 33–34; 56(a)1

Boudreau's leg and noted that "it's not even bleeding" and that Joker "just gouged it a little bit." Still, the BPD officer again asked Boudreau if he wanted medical attention, but Boudreau declined and stated, "No" and "I'll live." *See id.* at 18:51–19:08. Cullen and Riccio then transported Boudreau first to his rental car (to retrieve his personal items) and then to Wyatt Detention Facility in Central Falls, Rhode Island. *See* 56(a)1 Stmnt., Doc. No. 72-2, at ¶¶ 97–98.

      C.  <u>Discussion</u>

In this case, Boudreau alleges that the Federal defendants requested that the BPD use a canine officer to locate him. *See* Am. Compl., Doc. No. 113, at ¶ 18. Boudreau further asserts that after the Federal defendants placed him in custody, the Federal defendants and BPD officers agreed to detain him until the BPD Canine Officer arrived with Joker. *See id.* at ¶ 34. Finally, Boudreau believes that the Federal defendants and BPD officers then permitted Joker to approach Boudreau while he was handcuffed and to bite his leg. *Id.* at ¶¶ 43–44, 47. Boudreau thus claims, in relevant part, that the Federal defendants failed to intervene to prevent harm. *See id.* at ¶¶ 106–18. The Federal defendants maintain that they are not liable on the merits for a Fourth Amendment violation, and, alternatively, that they are entitled to qualified immunity. In my ruling on the Defendants' motion to dismiss, I explained that Boudreau's failure to intervene claim could usefully be divided into two parts: (1) failure to intervene by preventing Joker from approaching Boudreau; and (2) failure to intervene to prevent Joker from biting Boudreau. *See* Ruling, Doc. No. 50, at 14.

      *1.*    *The Law*

"The Fourth Amendment prohibits officers from using excessive force when arresting

---

Stmnt., Doc. No. 72-2, at ¶¶ 86–92.

criminal suspects." *Maye v. Vargas*, 638 F. Supp. 2d 256, 261 (D. Conn. 2009). Police officers "have an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in their presence by other officers." *Id.* (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (internal quotation marks omitted)). An officer who fails to intervene is liable for the preventable harm caused by other officers where that officer has reason to know that (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, and (3) a law enforcement officer has committed a constitutional violation. *See id.* (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (internal quotation marks omitted)). For a police officer to be liable for a failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557. "Whether an officer had a 'realistic opportunity to intervene . . . is a question of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Id.* (quoting *O'Neill*, 839 F.2d at 11–12).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken— decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v.*

*McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

A right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A right can be "clearly established" even without a "case directly on point" having established that right, but existing precedent must have placed the statutory or constitutional question beyond debate. *Id.* Even when a right is clearly established, qualified immunity protects government officials when it was objectively reasonable for them to believe that their conduct in the particular factual context at issue did not violate that clearly established right. *See Manganiello v. City of New York,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). I have discretion to determine the order in which I will address the above two inquiries (clearly established right and objective reasonableness). *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (citing *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).

2.      *Defendant Smith*

The Federal defendants maintain that Smith was not present at the Cue & Brew at the time of Boudreau's arrest and Joker's bite. Rather, according to his declaration, Smith was with Boudreau's rental vehicle at the Plaza. *See* Smith Decl., Doc. No. 72-7, at ¶¶ 14–23. Further, Smith had no access to BPD radio, was never at the Cue & Brew, and knew nothing about the details of Joker's track. *See id.*

Just as in actions for damages brought pursuant to Section 1983, a defendant's personal involvement is a prerequisite to a *Bivens* action. *See McIntosh v. United States*, 2016 WL 1274585, at *14 n.16 (S.D.N.Y. Mar. 31, 2016) (explaining that personal involvement inquiry is the same for both *Bivens* and Section 1983 actions); *see also Castellar v. Caporale*, 2010 WL 3522814, at *5 (E.D.N.Y. Sept. 2, 2010) (granting summary judgment to federal agents sued under *Bivens* because of no personal involvement); *Sash v. United States,* 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (same). A plaintiff may establish that a defendant was personally involved by showing that the defendant "(i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (citing *Colon*, 58 F.3d at 873).

Here, there is no evidence, or even a reasonable inference, that Smith was personally involved in the alleged failure to intervene in this case. Put simply, Smith waited by Boudreau's rental car in a parking lot some distance away from the Cue & Brew at the times relevant to this action. Smith did not know that the BPD Canine Officer had instructed Joker to find Boudreau inside the Cue & Brew, and Smith did not know that the BPD Canine Officer had permitted Joker to approach close enough to Boudreau to bite him. Smith does not appear in the Bodycam Footage depicting the events inside the Cue & Brew, and no evidence indicates that Smith was in contact with BPD officers during the relevant times. Further, no evidence indicates that Smith supervised Riccio or Cullen. Boudreau has adduced no evidentiary support for his claim that

Smith failed to intervene to prevent Joker from biting him.  Smith cannot be liable for the alleged failure to intervene.

### 3.     Failure to Intervene by Preventing Joker from Approaching Boudreau

The Federal defendants argue that Joker's approach is not a use of force prohibited by the Fourth Amendment, and, even if it were, that Cullen and Riccio are entitled to qualified immunity.  Boudreau retorts that allowing Joker to approach him while he was handcuffed represented unreasonable and excessive force, and that a reasonable jury could find that the Federal defendants had time to intervene to prevent Joker's approach.  *See* Pl.'s Opp'n, Doc. No. 124, at 22–23.  Specifically, Boudreau argues that a jury could find that the Federal defendants (1) requested that the BPD officers use Joker to help locate Boudreau; (2) knew the BPD Canine Officer would use Joker to track Boudreau; (3) could overhear the BPD officers' discussions about the BPD Canine Officer's continued use of Joker, even after Boudreau's arrest; (4) were aware that the BPD Canine Officer instructed Joker to find Boudreau while inside the Cue & Brew; and (5) had the opportunity to prevent Joker from approaching and biting Boudreau.  *See id.* at 1–5, 21–24, 42, 44; Sur-Reply, Doc. No. 131, at 2–3.

As a threshold matter, it is not clear that Boudreau's *Bivens* claim for failure to intervene states a claim under any circumstances.  In *Bivens*, the Supreme Court permitted the plaintiff's damages claim against federal officers to proceed when he alleged "an unlawful, warrantless search of his home and . . . an unlawful arrest."  *Doe v. Hagenbeck*, 870 F.3d 36, 42 (2d Cir. 2017) (citing *Bivens*, 403 U.S. at 389).  Since *Bivens*, the Supreme Court has implied a *Bivens* remedy in situations under just two other constitutional provisions (the Fifth Amendment and the

Eighth Amendment) that are irrelevant here,[5] and has, otherwise, "consistently refused to extend *Bivens* to any new context or new category of defendants." *See Correctional Services Corp. v. Malesko,* 534 U.S. 61, 68 (2001). Before extending a *Bivens* remedy to a new "context," a court should consider whether "Congress has created 'any alternative, existing process for protecting the [injured party's] interest' that itself may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Ziglar*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). Regardless of whether an alternative remedy exists, "a *Bivens* remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (internal citations and quotation marks omitted). Recently, the Court again refused to extend the *Bivens* remedy to a new "context" under the Fourth Amendment in the scenario of a fatal cross-border shooting. *See Hernandez v. Mesa*, 140 S. Ct. 735, 739 (2020).

Like the claim in *Bivens*, Boudreau's remaining failure to intervene claim arises under the Fourth Amendment. However, some lower courts in this circuit have explicitly refused to recognize a *Bivens* remedy for a failure to intervene. *See Martinez v. D'Agata*, 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 18, 2019). Other lower courts have indicated that they would reach that result if they had to, but they have passed on the question. *See, e.g.*, *Johnson v. O'Connel*, 2018 WL 5085702, at *13 (S.D.N.Y. Oct. 17, 2018); *Ojo v. United States*, 2019 WL 3852391, at *13 (E.D.N.Y. Aug. 15, 2019) *report and recommendation adopted* 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019). I join the second group of courts and note, specifically, that, in this case, Boudreau had the alternative remedy available (of which he availed himself) of

---

[5] *See Doe v. Hagenbeck*, 870 F.3d 36, 43 n.4 (2d Cir. 2017) (citing *Davis v. Passman*, 442 U.S. 228, 230–34 (1979) (Fifth Amendment); *Carlson v. Green*, 446 U.S. 14, 18–23 (1980) (Eighth Amendment)).

suing the BPD officers under Section 1983.  I need not decide definitively whether a *Bivens* remedy is available in this case because, even if it is, the Federal defendants are entitled to qualified immunity.

The mere presence of a police dog, even for purposes of intimidation, does not constitute excessive force.  *See Davis v. Egg Harbor Twp.,* 2017 WL 2423053, at *8 n.9 (D.N.J. June 5, 2017) (citing cases); *Cardona v. Connolly*, 361 F. Supp. 2d 25, 34 (D. Conn. 2005) (holding that an unprompted bite from a police dog "did not constitute a Fourth Amendment seizure").  Even assuming that the Federal defendants were aware that the BPD Canine Officer instructed Joker to find Boudreau—and that the Federal defendants had the opportunity to request Joker's removal from the Cue & Brew—no evidence suggests that the Federal defendants knew or should have known that BPD Canine Officer would allow Joker to approach Boudreau.  Moreover, no evidence indicates that the Federal defendants knew anything about either the BPD Canine Officer's or Joker's training or practices, and there is no indication that the Federal defendants were aware that Joker would bite the subject of his track.

The Federal defendants are entitled to qualified immunity because it was objectively reasonable for them to believe that their conduct at the time was not unlawful.  This case is similar to *White v. Harmon*, where two police officers complied with a police canine handler's request not to remove the suspect until the dog had finished his track, which resulted in the dog biting the suspect.  1995 WL 518865, at *2 (6th Cir. Aug. 31, 1995).  Although one of the two officers knew of a prior biting incident involving the dog, the two officers were not aware of the handler and dog's inadequate training or of the terms of the police canine policy; thus, the court held that a "reasonable official would not understand that it was objectively unreasonable to

17

heed" the canine handler's request to permit the dog to approach the suspect. *Id.* at *3. The officers in *Harmon* knew that the canine in that case had been involved in a previous biting incident; Riccio and Cullen knew nothing about Joker. And just as the canine officer in *Harmon* asked the officers to detain the defendant until the canine finished its track, the BPD Canine Officer in this case asked the BPD officers—not even Riccio and Cullen—to detain Boudreau until Joker finished his track. If the two officers in *Harmon* were entitled to qualified immunity, then Riccio and Cullen are all the more so here. At most, the Federal defendants acted negligently by failing to prevent Joker from approaching Boudreau. However, mere negligence is insufficient to establish liability for a violation under the Fourth Amendment, which "only protects individuals against 'unreasonable' seizures, not seizures conducted in a 'negligent' manner." *See Dodd v. City of Norwich,* 827 F.2d 1, 7–8 (2d Cir. 1987).

### 4. *Failure to Intervene to Prevent Joker from Approaching Boudreau*

Boudreau maintains that Joker bit him twice. *See* Pl.'s Opp'n, Doc. No. 124, at 22.[6] Even construing Joker's first contact with Boudreau as a bite, I conclude that a jury could not reasonably infer that Cullen and Riccio had a realistic opportunity to intervene when Joker made his first contact with Boudreau. Bodycam Footage shows that Joker's first contact with Boudreau lasted approximately one second. *See* Video 3, Doc. No. 72-9, at 7:14. "Often it is impossible for an officer to have a reasonable opportunity to intervene if the alleged use of force was quick and isolated." *Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 623 (D. Conn. 2016); *see also O'Neill*, 839 F.2d at 11 (three blows to plaintiff's head occurred in such rapid succession that officer had no realistic opportunity to intervene); *Parks v. Segar*, 2012 WL

---

[6] However, as noted above, in his amended complaint Boudreau characterized the first "bite" as a "nudge." *See* Am. Compl., Doc. No. 113, at ¶ 45.

4051833, at *4 (D. Conn. Sept. 13, 2012) (jury could not reasonably conclude that officer had reasonable opportunity to intervene to prevent dog bite which lasted for "half a second to a second"); *Johnson v. City of New York*, 2008 WL 4450270, at *6 (S.D.N.Y. Sept. 29, 2008) (officer had no reasonable opportunity to intervene when alleged use of force lasted only "a couple of seconds").

As detailed above, the BPD Canine Officer continued to control Joker during the 11 seconds between Joker's first contact with Boudreau and the later, undisputed bite. Also during that time, a ring of BPD officers surrounded Boudreau. Riccio and Cullen were outside that ring, and Cullen was on the phone. Neither the BPD officers nor Boudreau looked alarmed or disturbed during those interim 11 seconds. Indeed, Boudreau continued to make small talk with the BPD Canine Officer—"Is he still in training?"—and exhibited no external signs of distress, which might have alerted Riccio and Cullen that Joker posed a risk to Boudreau. Again, no evidence indicates that Riccio or Cullen had any familiarity with the BPD Canine Officer's or Joker's training or practices. Put simply, Riccio and Cullen did not know, and there was no reason for them to have known, that the BPD Canine Officer would continue to command Joker to come close to Boudreau despite the risk of injury that Joker posed.

Thus, although 11 seconds was enough *time* for Riccio or Cullen to have intervened, there was no indication that the BPD Canine Officer's handling of Joker presented an imminent threat of excessive force. *See Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2614 (2019) ("crucial question" under the qualified immunity analysis is "whether the official acted reasonably in the particular circumstances that he or she faced") (internal quotation marks and citation omitted). Under those circumstances, it was objectively reasonable for Riccio

and Cullen to believe their conduct—not to intervene or interrupt the BPD Canine Officer's continued instructions to Joker—was not unlawful at the time. *See Harmon*, 1995 WL 518865, at *3 (holding that, although canine handler's bringing dog "into immediate presence of the handcuffed plaintiff the dog was 'tracking' [and] close enough to permit the dog to bite the plaintiff," officers who had no knowledge about the dog or its handler's lack of training were entitled to qualified immunity on excessive force claim).

D. Conclusion

In sum, Defendant Smith is entitled to summary judgment because he was not personally involved in the alleged constitutional violation. And Defendants Riccio and Cullen are entitled to summary judgment because they are entitled to qualified immunity for their alleged role in Boudreau's dog bite. Thus, the Defendants' motion for summary judgment, doc. no. 72, is **granted**.

## II. Boudreau's Motion for Sanctions (Doc. No. 110)

During discovery in this case, Boudreau sought to obtain Cullen's text messages from the night in question, but he was unable to do so. *See* Ruling, Doc. No. 102, at 15–16. Cullen was unable to provide Boudreau with those text messages because, he said, DHS switched phone carriers (from Sprint to Verizon) in 2016, and his text messages were lost as a result. *See* Defs.' Obj. to Mot. for Sanctions, Doc. No. 111, at 2. Boudreau argues that the Defendants' failure to retain Cullen's text messages constituted spoliation of evidence and requested that I sanction Cullen under Fed. R. Civ. P. 37(e)(2). (Boudreau had written a letter to the DHS field office in Rhode Island dated January 12, 2016 indicating his intent to pursue litigation against the DHS

officers involved in his December 2015 arrest. *See* Boudreau Letter, Doc. No. 111-1, at 1.) I allowed Boudreau the opportunity to serve requests on DHS for documents concerning DHS's cell phone carrier switch in February 2016 and its retention policies for text messages on DHS employees' phones. *See* Ruling, Doc. No. 138, at 11. I also requested that the Defendants provide Boudreau with information concerning the receipt date of his letter dated January 12, 2016 and to search the Cloud for back-ups of Cullen's text messages, and, if found, to provide them to Boudreau. *See id.* at 11–12.

I deferred ruling on the motion for sanctions until Boudreau filed his supplemental memorandum based on any new information he received from Defendants and DHS. *See id.* at 12. After the Defendants filed their response to my order, Boudreau filed his supplemental memorandum. *See* Response, Doc. No. 140; Pl.'s Supp. Mem., Doc. No. 141. In the days that followed, the Defendants responded again, and Boudreau filed another supplemental memorandum and reply. *See* Response, Doc. No. 142; Pl.'s Add'l Mem. in Supp., Doc. No. 143; Reply, Doc. No. 144. For the reasons that follow, I conclude that no sanctions are warranted and so **deny** Boudreau's motion.

A. Defendants' Response

In response to my prior Ruling, the Defendants have submitted materials regarding (1) DHS's 2016 decision to switch carriers from Sprint to Verizon; (2) the receipt of Boudreau's letter dated January 12, 2016; and (3) the Defendants' search for back-ups of Cullen's text messages. *See* Response, Doc. No. 140.

1.      *Switch from Sprint to Verizon*

DHS provided an affidavit from Leonard Pulley.[7]  *See* Pulley Aff., Ex. A to Defs.'

Response, Doc. No. 140-1.  Pulley avers that on October 30, 2015, Sprint informed the General

Services Administration that Sprint would not renew its contract with the federal government set

to expire on April 5, 2016.  *See id.* at ¶ 4.  Thus, in February 2016, the United States Immigration

and Customs Enforcement ("ICE") agency decided to migrate from Sprint to Verizon, which

since 2013 had also been a designated carrier within DHS.  *See id.* at ¶¶ 2–4.  Pulley explains

that, as part of that transition, ICE instructed its employees to wipe clean their iPhone 5S

devices; to return them; and to obtain a new iPhone 6 device.  *See id.* at ¶ 5.  Pulley represents

that Cullen's cell phone number was migrated from Sprint to Verizon on February 23, 2016.  *See*

*id.*  Pulley also states that the Office of the Chief Information Officer has no policy or guidance

on short messaging service ("SMS") or text service used by ICE employees, although carriers or

service providers may retain SMS or text messages for 30 days.  *See id.* at ¶ 6.

### 2.    *Receipt of Boudreau's Letter Dated January 12, 2016*

The defendants have submitted an email chain that reflects that Boudreau's letter dated

January 12, 2016 was received by Special Agent James Richardson at the HSI field office in

Providence, Rhode Island by, at the latest, January 26, 2016.  *See* Email Chain, Ex. B to Defs.'

Response ("Email Chain"), Doc. No 140-2, at 4.  On January 26, in an email entitled

"BOUDREAU Law Suit Letter," Richardson forwarded Boudreau's letter to Cullen, who then

forwarded the email to Jerry DeMaio, ICE's Assistant Chief Counsel.  *See id.* at 3–4.  Cullen

wrote: "Jerry, Please see the attached letter that we received from a defendant regarding his

recent arrest.  Please give me a call at your convenience to discuss."  *Id.* at 3.  DeMaio

---

[7]  Pulley is Branch Chief of Infrastructure Project Services, Information Technology Operations Division, Office of
the Chief Information Officer, United States Immigration and Customs Enforcement, DHS.  *See* Pulley Aff., Ex. A

subsequently forwarded the "BOUDREAU Law Suit Letter" email to District Court Litigation Division Deputy ("DCLD") Chief Scott Whitted.  *See id.*  DeMaio explained the facts of the case (from his perspective) and that Joker "nipped" Boudreau "in the knee during the arrest."  *Id.*  DeMaio added that the BPD Canine Officer had "a body camera on during the arrest" and that "the individual who wrote this letter has sent similar ones to various other [law enforcement] agencies related to other slights, real or perceived."  *Id.*

Deputy Chief Whitted responded shortly thereafter: "I don't know if Mr. Boudreau actually will file a suit, but while we're waiting to find out, please tell HSI to retain all notes, reports, etc. they have on the incident.  Also, it would be helpful if HSI could ask the Branford PD to 1) retain the video from the body camera, and 2) if possible give a copy to HSI."  *Id.* at 2. In a return email, DeMaio wrote:  "Thanks. That's exactly what I've already advised them."  *Id.* In an email ten minutes later, Deputy Chief Whitted responded:

> Perfect. If he actually files a claim or a suit, then DCLD can issue a preservation notice.  I don't want to go through that drill . . . right now and potentially waste the time of a lot of people, in reaction to what might be an idle threat by someone who is in jail with a lot of time on his hands.

*Id.*

### 3.     *Search for Text Messages*

Pulley represents that the Office of the Chief Information Officer does not retain cellular or wireless information in its Cloud data offerings.  *See* Pulley Aff., Doc. No. 140-1, at ¶ 6. Thus, Pulley represents, "ICE cannot search the Cloud for SMS messages because they are not stored in the Cloud."  *Id.*

### B.  Discussion

---

to Defs.' Response, Doc. No. 140-1, at 1.

In his Motion for Sanctions, Boudreau seeks monetary sanctions, an adverse inference, judgment in his favor, an order striking the motion for summary judgment, or any other sanction I might deem just and proper.  *See* Mot. for Sanctions, Doc. No. 110, at 1, 14–18; Pl.'s Supp. Mem., Doc. No. 141, at 12–14.  In prior rulings, I had ordered Cullen to disclose his cell phone records from December 29, 2015.  *See* Ruling, Doc No. 102, at 15–16; Ruling, Doc. No. 112 at 18.  On September 6, 2019, Cullen provided Boudreau with a telephone log from the night of December 29, 2015, but defendants advised Boudreau that Cullen could not obtain text message information due to a switch in carrier in February 2016 that resulted in the loss of all Cullen's text messages.  *See* Defs.' Notice, Doc. No. 115, at 1; Defs.' Obj. to Mot. for Sanctions, Doc. No. 111, at 10.

A district court may impose sanctions for spoliation in violation of a court order.  *See* Fed. R. Civ. P. 37(b)(2).  Further, a court may sanction a party if electronically stored information ("ESI") "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it."  Fed. R. Civ. P. 37(e)(2).  If prejudice results from loss of that ESI, a court may "order measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).  And, if a party "acted with the intent to deprive another party of the information's use in the litigation," the court may "presume that the lost information was unfavorable" to the other party, instruct the jury on such an adverse inference, or "dismiss the action."  Fed. R. Civ. P. 37(e)(2).

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  "The party seeking

discovery sanctions on the basis of spoliation must show by a preponderance of the evidence: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). "Actual present and possible future litigation" represent "catalysts of equal strength for the preservation of evidence." *Bagley v. Yale Univ.*, 318 F.R.D. 234, 240 (D. Conn. 2016). If a party did have an obligation to preserve evidence, the court "must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." *Fujitsu*, 247 F.3d at 436.

As the movant, Boudreau bears the burden to demonstrate by clear and convincing evidence that Cullen spoliated his text messages intentionally to deprive him of their use in this litigation. *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016) (finding "clear and convincing" the proper standard for analyzing an intent to deprive under Rule 37(e)(2)).[8] Absent evidence sufficient for sanctions under Rule 37(e)(2), relief for spoliation of ESI may include "measures no greater than necessary to cure the prejudice" caused by the spoliation. Fed. R. Civ. P. 37(e)(1).

Boudreau contends that the Defendants had notice of their duty to preserve evidence relevant to this litigation when they received his January 12, 2016 letter, which indicated his intent to file an action alleging excessive force and negligent failure to intervene based on the events of December 29, 2015. *See* Mot. for Sanctions, Doc. No. 110, at 1–2; Boudreau Letter, Doc. No. 36-8, at 4. The Defendants counter that any obligation to preserve evidence did not arise until Fall 2017, when Boudreau served them with his *Bivens* complaint.[9] Defs.' Obj. to Mot. for Sanctions, Doc. No. 111, at 7, 12. Before then, the Defendants argue, they did not have notice of Boudreau's potential claim based on their failure to intervene in Joker's *approach*. *Id.* at 7–8. Rather, the Defendants explain, Boudreau's letter dated January 12, 2016 indicated that his failure to intervene claim against the Federal defendants would focus on their negligence when a BPD officer allegedly gave "gestures and commands" for Joker to bite Boudreau while he was handcuffed. *Id.* at 8. The Defendants argue that Cullen's cell phone records were not relevant to Boudreau's allegation at that time. *See id.* When the Federal defendants' actions leading *up to* the bite became an issue in the case—in Fall 2017, well after the switch in carrier in February 2016—the Defendants promptly issued a Preservation Notice for ESI. *See id.* at 15; Preservation Notice, Doc. No. 111-2.

As I recently observed, the contents of Boudreau's January 12, 2016 letter—which was received by January 26, 2016 at the HSI Rhode Island field office—evinces Boudreau's intent to pursue litigation against the DHS officers involved with his December 2015 arrest, and DHS should have understood that it had an obligation to preserve evidence—including cell phone

---

[8] To satisfy the clear and convincing evidence standard, there must be "evidence indicating that the thing to be proved is highly probable or reasonably certain." *Dongguk Univ. v. Yale Univ.*, 873 F. Supp. 2d 460, 466 (D. Conn. 2012) (quoting *Ragbir v. Holder,* 389 F. App'x 80, 84–85 (2d Cir. 2010)).

[9] Boudreau filed his federal complaint on April 10, 2017, and service on Defendants was complete as of October 20,

records—relevant to the time period prior to the approach and bite.  *See* Ruling, Doc. No. 138, at

9–10; Boudreau Letter, Doc. No. 111-1, at 1.  Indeed, certain individuals within DHS knew they

should retain all relevant information upon receipt of Boudreau's January 2016 letter: Deputy

Chief Whitted instructed DeMaio to tell the Federal defendants "to retain all notes, reports, etc.

they have on the incident" and to have "the Branford PD . . . retain the video from the body

camera."  Emails, Doc. No. 140-2, at 2.

     Although DeMaio's and Whitted's emails are rather flippant, I conclude that Cullen's

failure to take measures to retain his cellular data constituted, at most, negligence rather than a

"conscious dereliction of a known duty to preserve" his cellular data.  *See Ungar v. City of New

York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018).  Cullen notified DeMaio of Boudreau's letter, and

DeMaio indicated that a preservation notice would not be issued until Boudreau actually filed a

claim or lawsuit.  Emails, Doc. No. 140-2, at 2.  However, DeMaio apparently advised Cullen to

"retain all notes, reports, etc." that he had regarding the December 2015 incident.  *See id.*  About

one month later, ICE instructed Cullen to wipe his cell phone clean and trade it in for a different

phone.  Cullen apparently did as he was told.  He did not stop to consider whether doing so

would compromise a future preservation duty arising from the December 2015 incident with

Boudreau.  The loss of Cullen's text messages was unfortunate, but Cullen did not destroy his

text messages for the purpose of depriving Boudreau of those text messages.  Cullen simply

followed Department-wide instructions to wipe his cell phone in preparation for the February

2016 carrier migration.  *See Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at

*16 (S.D.N.Y. Mar. 12, 2018) (noting that intent may be inferred by circumstantial evidence but

declining to impose sanctions for spoliation where "the presented evidence may be capable of

more than one interpretation" and "does not clearly and convincingly show" defendants deleted emails for the purpose of keeping them from plaintiff).

The fact that the February 2016 Department-wide migration followed closely after HSI's Rhode Island field office received Boudreau's letter does not suggest that Cullen destroyed his cell phone data to deprive Boudreau of its use in this litigation. As I have previously remarked, it was unlikely that Boudreau's January 2016 letter spurred a Department-wide phone carrier switch. *See* Ruling, Doc. No. 138, at 10. Pulley also averred that the switch was precipitated by Sprint's December 2015 notice that it would not renew its contract with the federal government. *See* Pulley Aff., Doc. No. 140-1, at ¶ 4. In any event, temporal proximity alone does not necessarily establish clear and convincing evidence of intent. *See Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *22 (S.D.N.Y. June 20, 2019); *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2019 WL 6838672, at *6 (S.D.N.Y. Dec. 16, 2019).

Because I hold that clear and convincing evidence does not establish that Cullen intentionally deprived Boudreau of the use of Cullen's text messages, I decline to impose one of the severe (but permissive) sanctions contemplated under Fed. R. Civ. P. 37(e)(2), including an adverse inference or dismissal of the action. I also decline to impose a lesser sanction on Cullen—such as the cost of copying and mailing involved in Boudreau's discovery motion practice—under Fed. R. Civ. P. 37(e)(1). That is because—although I noted that records of Cullen's texts might have been relevant to whether Cullen and Riccio failed to intervene when the BPD officers permitted Joker to approach Boudreau, *see* Ruling, Doc. No. 138, at 6–7—it is not clear that they were, and so Boudreau was not clearly prejudiced by not having them. The

Bodycam Footage in this case supports that view: neither Cullen nor Riccio is apparently privy to the BPD radio communications, and neither of them is in Boudreau's immediate vicinity.

For the foregoing reasons, Boudreau's motion for sanctions, doc. no. 110, is **denied**.

\*       \*       \*

As detailed above, the Defendants' motion for summary judgment, doc. no. 72, is **granted**, and Boudreau's motion for sanctions, doc. no. 110, is **denied**. The Clerk is directed to enter judgment for the Defendants and close the case.

SO ORDERED at Bridgeport, Connecticut this 31st day of March 2020.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge